FRANK O. HAWLEY *et al.*

*v.*

CHRISTINE J. HAWLEY.

*Opinion filed June 17, 1899—Rehearing denied October 5, 1899.*

APPEALS AND ERRORS—*Supreme Court will not lightly disturb chancellor's findings of fact from oral testimony.* A decree sustaining a petition for dower and finding that petitioner was lawfully married to the deceased, and that there was no fraudulent impersonation of the deceased when the marriage ceremony took place, will not be reversed by the Supreme Court on the facts, where the evidence, though conflicting, tends to support the findings of the chancellor, who saw and heard the witnesses.

Appeal from the Circuit Court of Kendall county; the Hon. GEORGE W. BROWN, Judge, presiding.

CHARLES WHEATON, and S. N. HOOVER, for appellants.

HANCHETT & PLAIN, ALSCHULER & MURPHY, and R. B. SCOTT, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Appellee, claiming to be the widow of Paul G. Hawley, deceased, filed her petition for dower in the court below, which, on the final hearing, was sustained by the chancellor and a decree was entered accordingly.

Paul G. Hawley was a practicing lawyer and had for many years resided in Oswego, in Kendall county, where he had accumulated an estate of considerable value, consisting mostly of real estate. He died intestate February 10, 1898, at the age of upwards of seventy years. In early life he had married, and as the issue of such marriage there were born to him three sons, (two of whom are the appellants,) and also a daughter, who died before the death of her father and left him a granddaughter, which granddaughter and the three sons were witnesses on the trial in the court below. About fifteen years before his

death his wife obtained a decree of divorce and thereaf-
ter resided with her son, the appellant Frank O. Hawley,
in Aurora.  Upon one of the farms of Paul G. Hawley
near Oswego, called the "Parker place," lived appel-
lee, Christine J. Olsen, then a widow.  Hawley was her
professional adviser in the settlement of her husband's
estate, and they became intimately acquainted, and for
several years prior to his death were often seen together
at his office, his farm, and traveling in railway coaches
going from or returning to Oswego.  The petitioner al-
leged that on the 21st day of July, 1897, she and her little
boy, upwards of four years old, accompanied Paul G.
Hawley to Kenosha, Wisconsin, where she and Hawley
were married, and that on the same day they returned to
Oswego, or rather to her home on the Parker farm near
Oswego, where they thereafter lived together as husband
and wife until his death, about seven months later.  In
support of her petition she gave in evidence a marriage
certificate in due form under the laws of Wisconsin, show-
ing such marriage, and also produced the clergyman who
performed the ceremony and made the certificate, and
his two daughters, who witnessed both.  It cannot be
doubted, and is not denied by appellants, that such a
ceremony took place on the date and at the place men-
tioned, between appellee and some man who represented
himself to be Paul G. Hawley of Oswego, Illinois, but
their contention was and is that there was a fraudu-
lent impersonation of their father by some unknown man,
who conspired with appellee to manufacture evidence of
a marriage between her and their father, said Paul G.
Hawley.  In support of their position they offered evi-
dence that after such supposed marriage the parties con-
tinued to live as they had before; that she continued to
be known as Mrs. Olsen and that he so called her, and
that when questioned concerning rumors of his marriage
he denied that he had married her, and on his death-bed
stated that the only claim she had was as housekeeper.

The evidence on both sides shows that Wednesday, the 21st day of July, when said marriage in Wisconsin, real or pretended, took place, was the second day of the public races then in progress at the city of Aurora, distant about six miles from Oswego, where large numbers of people gathered to see the horse racing, and appellants produced numerous witnesses who testified that they were present at the races on that Wednesday and saw Paul G. Hawley there in attendance upon the races. Then, again, appellee produced other witnesses who gave testimony tending to prove that it was Thursday, and not Wednesday, that Hawley attended the races at Aurora. Appellant Carlton M. Hawley testified that at his father's request he hitched his father's horse to a buggy at Oswego about 11:30 o'clock on that Wednesday morning, and he and Frank O. Hawley testified that the latter and their father got into the buggy, and Frank O. Hawley testified that he and his father then drove to Aurora and attended the races there. It is undisputed that if his testimony is true and Paul G. Hawley did attend said races on that day he could not have been present at the marriage ceremony at Kenosha, Wisconsin, on the same day. It is clear, however, from the evidence, that he could have left Oswego with appellee after nine o'clock in the morning of that day and arrived at Kenosha before the time at which the evidence shows the ceremony took place, and then, after the marriage, could have returned and arrived at Oswego shortly after six o'clock in the evening of the same day, as the evidence strongly tends to prove he did. It was clearly proved by the testimony of many witnesses, which seems to be practically uncontroverted, that Paul G. Hawley was seen in company with appellee and her little boy on the train which left Oswego about nine o'clock A. M. on that same Wednesday, going in the direction of Aurora and Chicago. No witness testified that he got off at Aurora, but one or more that he went into the coach which at Aurora was attached to the

Chicago train, and several witnesses testified that they saw him on the train after it left Aurora for Chicago, and also after he left the train at the Union depot in Chicago, and that he was then in company with appellee and her little boy. Two of these witnesses also testified that they returned in the afternoon of the same day and saw Paul G. Hawley with appellee and the boy get on the train which left Chicago at 4:30 P. M. and saw them get off at Oswego. True, this testimony is attacked by appellants, and some circumstances appear which have some tendency to show that the witnesses who testified that they saw Mr. Hawley on the train after it left Aurora for Chicago, and saw him at the depot in the latter city, and saw him on his return in the evening, may possibly have been mistaken in the date; but they fixed the date positively as the day before "Logan Day," as it was called,—that is, the day the Logan monument was dedicated in the city of Chicago,—and in view of that fact and others shown we cannot find that they were mistaken in their testimony or that it was untrue. It is practically without denial that Paul G. Hawley went from Oswego to Aurora that morning on the same train with appellee and her child, and if appellants' contention be true that he attended the races on that day at Aurora in company with his son Frank, then he must have left the train at Aurora, gone back to Oswego, and then, within an hour or less time, must have driven back to Aurora with his said son to attend the races, while Mrs. Olsen went on her way to Wisconsin to go through with a pretended marriage to him. The evidence shows that it was possible for him to do this, but there was no direct nor sufficient evidence that he did do so.

Appellants contend that the description given by the clergyman and his daughters of the man who, under the name of Paul G. Hawley, married appellee that day, shows that the man was not Paul G. Hawley, and point out many differences between the man described and Mr. Hawley;

but we are of the opinion the resemblances are more than the differences shown, and, without entering into detail, that on the whole their description of the man tended to the identification of Paul G. Hawley. It was also proved that when the son, Frank, went to Kenosha after his father's death, and under the assumed name of Smith interviewed the clergyman, the latter told him that if his name had not been different he would have taken him for a son or relative of the man whom he had married to appellee. It also appears that Mr. Hawley desired to keep his marriage secret from his sons. His brother, William Hawley, testified that he had previously conversed with him about marrying appellee in Chicago, but when he (Paul) found that he could not keep it secret if he should be married there he spoke of going to Wisconsin. This witness, his wife and others, also testified that after the marriage Paul G. Hawley introduced appellee to them as his wife. One of the heirs, the granddaughter above mentioned, gave testimony to the same effect. Mrs. Jewell, sister of the deceased, testified to conversations she had with her brother Paul the day before and on the morning of the day in question, in which he said he was going to Kenosha, Wisconsin, to marry appellee, and testified also that on his return she congratulated him on his marriage, and that he told her he was going over to the Parker place to live with his wife. Prior to the day in question he had boarded with Mrs. Jewell much of the time but ceased to do so after his marriage, and he persuaded her to take up her abode with him and his wife at the Parker place, and she did so within a month after the marriage and continued to live there until his death, and afterward. Many other facts and circumstances were proved tending on the one hand to prove and on the other to disprove the marriage, but their rehearsal here could serve no useful purpose.

We have given the voluminous record a careful examination, and are wholly unable to reach the conclusion so

strenuously contended for by appellants, but are of the opinion that by the great weight of the evidence it appears that appellee was married to Paul G. Hawley at Kenosha, in the State of Wisconsin, on July 21, 1897, as alleged by her, and that the court below was correct in so deciding. In view of the fact that the chancellor of the circuit court saw and heard the witnesses testify, and thus had better opportunities than we have to pass upon their credibility and the proper weight to be given to their testimony, we could not, under numerous and long established precedents, disturb the decree even were the evidence supporting it much weaker than that found in this record, a part of which we have stated.

The decree must be affirmed.          *Decree affirmed.*